# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

RAHUL SHAH, MD,
ON ASSIGNMENT OF SHEILA H.,

       Plaintiff,

   v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

       Defendant.

1:17-cv-00711-NLH-AMD

**OPINION**

---

**APPEARANCES**:

SAMUEL S. SALTMAN
CALLAGY LAW PC
MACK-CALI CENTRE II
SUITE 558
650 FROM ROAD
PARAMUS, NJ 07652
    On behalf of Plaintiff

MICHAEL E. HOLZAPFEL
BECKER LLC
354 EISENHOWER PARKWAY
SUITE 1500
LIVINGSTON, NJ 07039
    On behalf of Defendant

**HILLMAN**, District Judge

    This case is similar to numerous other cases filed by this

plaintiff and related plaintiffs in this District[1] asserting

---

[1] For two examples, see <u>Shah v. Blue Cross Blue Shield of New Jersey</u>, 1:17-cv-00632-NLH-AMD and <u>Shah v. Blue Cross Blue Shield of New Jersey</u>, 1:17-cv-8590-RMB-KMW.

claims by an out-of-network physician, as a purported assignee of his patient's rights, against a benefits plan for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiff claims the benefits plan paid him $7,106.44 for what he valued to be a $238,310.00 elective spinal surgery.

Defendant has moved for summary judgment in its favor on all of Plaintiff's claims, arguing that the patient's purported assignment of her rights to Plaintiff is invalid, and even if it is valid, Defendant is entitled to judgment in its favor that it did not act arbitrarily and capriciously when it reimbursed Plaintiff according to its plan terms governing payments to out-of-network providers. For the reasons expressed below, Defendant's motion will be granted.

<u>**BACKGROUND**</u>

On February 3, 2016, Plaintiff, Rahul Shah, M.D., who practices in New Jersey, performed a non-emergency, elective, outpatient spinal surgery on his patient, Sheila H., who resides in Pennsylvania. The patient had health coverage through a self-insured group health benefits plan sponsored and funded by Kellogg Company (the "Plan"), which the Kellogg Company made available to its active, regular, full-time employee members, and their dependents, of the Bakery, Confectionary, Tobacco Workers' and Grain Millers Local 6 Union in Pennsylvania. As of

January 1, 2016, the Kellogg Company retained Defendant Blue Cross Blue Shield of Michigan ("BCBSM") to provide claims administration services for the Plan. As an "employee welfare benefit plan," the Plan is governed by and subject to ERISA.

At the time of the surgery, Plaintiff was an out-of-network, nonparticipating provider under the Plan. The patient purportedly assigned her rights to benefits under the Plan to Plaintiff, who then filed for reimbursement for the surgery from Defendant. Plaintiff submitted a claim for $238,310.00, and the Plan paid Plaintiff $7,106.44. Plaintiff followed the Plan's appeal process, with the Plan ultimately concluding that the reimbursement amount was properly calculated at the rate prescribed by the Plan.

Plaintiff argues that he charged usual, customary, and reasonable ("UCR") rates and that a common sense interpretation of the Plan dictates that it reimburse out-of-network providers at 70% of the provider's UCR charges. Plaintiff contends that the Plan violated ERISA by not reimbursing him 70% of his UCR rates, and instead improperly paid him only 70% of 150% of the Medicare reimbursement rate, a rate not listed anywhere in the Plan. Plaintiff claims that Defendant violated ERISA § 502(a)(1)(B)[2] and demands additional benefits owed to him, and

---

[2] 29 U.S.C. § 1132(a)(1)(B).

also alleges a breach of fiduciary duty in violation of ERISA § 404.[3]  Plaintiff seeks $231,203.56 in unpaid benefits, plus interest, attorney's fees, and costs.

Defendant has moved for summary judgment in its favor. Plaintiff has opposed Defendant's motion.

## DISCUSSION

### A.   Subject matter jurisdiction

Defendant removed this action to this Court from the Superior Court of New Jersey, Law Division, Cumberland County pursuant to 28 U.S.C. §§ 1331, 1441(a) & (c), and 28 U.S.C. § 1446.  Federal question jurisdiction exists in this matter pursuant to 28 U.S.C. § 1331, which provides that the district court has original jurisdiction of "all civil actions arising under the Constitution, laws or treaties of the United States." ERISA further provides that the district courts of the United States shall have at least concurrent, and sometimes exclusive, jurisdiction over the ERISA causes of action pleaded in the complaint. 29 U.S.C. § 1132(e)(1).

### B.   Standard for Summary Judgment

Summary judgment is appropriate where the Court is

---

[3] 29 U.S.C. § 1104.  Plaintiff's complaint also asserted a count for breach of contract under state law and a count for violation of 29 C.F.R. § 2560.503-1, an ERISA timing and disclosure regulation governing the claims adjudication and appeals process.  Plaintiff has agreed to dismiss those claims.  (See Docket No. 19 at 16-17.)

satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a

genuine issue for trial.  Id.  Thus, to withstand a properly

supported motion for summary judgment, the nonmoving party must

identify specific facts and affirmative evidence that contradict

those offered by the moving party.  Anderson, 477 U.S. at 256-

57.  A party opposing summary judgment must do more than just

rest upon mere allegations, general denials, or vague

statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.

2001).

   C.   **Analysis**

      1.   ***Whether Plaintiff has standing to bring his
            claims***

Defendant argues that the Plan participant's assignment of

benefits to Plaintiff is invalid, and Plaintiff therefore lacks

standing to bring his claims.[4]  Plaintiff disagrees, arguing that

the assignment is unambiguous and clearly assigns to him the

participant's right to benefits under the Plan, as well as the

ability to bring suit against the Plan.

"[A] federal court generally may not rule on the merits of

a case without first determining that it has jurisdiction over

the category of claim in suit (subject-matter jurisdiction) and

_____

[4] A facial challenge to ERISA standing may be brought pursuant to
Fed. R. Civ. P. 12(b)(1), and that challenge, if not successful
at the motion to dismiss stage, may be renewed at summary
judgment as a factual challenge.  Sleep and Wellness Medical
Associates, LLC v. Horizon Healthcare Services, Inc., 2015 WL
8464796, at *1 n.1 (D.N.J. 2015).  Defendant raises the standing
issue for the first time through its summary judgment motion.

the parties (personal jurisdiction)."[5] <u>Sinochem Int'l Co. v.</u>
<u>Malay. Int'l Shipping Corp.</u>, 549 U.S. 422, 430-31 (2007).
"'Without jurisdiction the court cannot proceed at all in any
cause'; it may not assume jurisdiction for the purpose of
deciding the merits of the case." <u>Id.</u> at 431 (quoting <u>Steel Co.</u>
<u>v. Citizens for Better Env't</u>, 523 U.S. 83, 94 (1998)). The
standing requirement is no different for an action brought under
ERISA. <u>See</u> <u>Leuthner v. Blue Cross & Blue Shield of Ne. Pa.</u>, 454
F.3d 120, 125 (3d Cir. 2006) (providing that a plaintiff must
have constitutional, prudential, and statutory standing to bring
a civil action under ERISA).

ERISA confers standing upon a participant in, or
beneficiary of, an ERISA plan by allowing that participant or
beneficiary to bring a civil action to "recover benefits due to
him under the terms of his plan, to enforce his rights under the
terms of the plan, or to clarify his rights to future benefits
under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). This
provision also confers standing upon a medical provider to sue
the plan through an assignment from a plan participant.
<u>American Chiropractic Ass'n v. American Specialty Health Inc.</u>,
625 F. App'x 169, 174-75 (3d Cir. 2015) (quoting <u>CardioNet, Inc.</u>

---

[5] The parties do not raise any concerns over personal
jurisdiction.

7

<u>v. CIGNA Health Corp.</u>, 751 F.3d 165, 176 n.10 (3d Cir. 2014)).[6]

An assignment of the right to payment assigns the right to enforce that right by bringing suit under ERISA to collect money owed. <u>Id.</u> (citing <u>N. Jersey Brain & Spine Ctr. v. Aetna, Inc.</u>, 801 F.3d 369 (3d Cir. 2015)). Such an assignment "serves the interest of patients by increasing their access to care" and reduces the likelihood of medical providers "billing the beneficiary directly and upsetting his finances." <u>Id.</u> (quoting <u>CardioNet</u>, 751 F.3d at 179 (quotation marks omitted)). The right to enforce also recognizes that most providers, as compared to patients, "are better situated and financed to pursue an action for benefits owed for their services." <u>Id.</u>

_____

[6] Plaintiff's allegations must also be sufficient to confer Article III standing. <u>See</u> <u>American Chiropractic Ass'n v. American Specialty Health Inc.</u>, 625 F. App'x 169, 175 n.11 (3d Cir. 2015) (citations omitted) (noting that because the plaintiff alleges that he sustained an injury in fact by defendant's failure to fully pay for the services he rendered that he contends were covered by the Plan, the plaintiff also had Article III standing to pursue this relief) (citing <u>Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.</u>, 770 F.3d 1282, 1287–91 (9th Cir. 2014) (holding that medical provider had Article III standing under form assigning its patients' "rights and benefits" even though medical provider "ha[d] not sought payment from its assigning patients for any shortfall" prior to bringing suit); <u>N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare</u>, 781 F.3d 182, 193–94 (5th Cir. 2015) (following <u>Spinedex</u> and noting that "[t]he fact that the patient assigned her rights elsewhere does not cause them to disappear" so as to deprive provider-assignee Article III standing). Plaintiff has sufficiently articulated an injury-in-fact by contending that the Plan failed to properly reimburse him under the terms of the Plan.

(citation omitted).

In this case, on January 20, 2016, the Plan participant signed a one-page "Assignment of Benefits & LTD. Power of Attorney & Medical Records Authorization," which lists at the top "Premier Orthopaedic Associates of Southern New Jersey," and three providers' names: "Thomas A Dwyer, M.D., Rahul V. Shah, M.D., Christian Brenner, PA-C." (Docket No. 1 at 27.) The assignment provides, in part, "I irrevocably assign to you, my medical provider, all of my rights and benefits under my insurance contract for payment for services tendered to me, including but limited to my rights under 'ERISA' applicable to the medical services at issue. I specifically assign to you all of my rights and claims with regard to the employee health benefits at issue (including claims for the assessment of penalties and for attorneys' fees) arising under ERISA or other federal or state law." (Id.)

Defendant argues that the assignment is inherently ambiguous because the document generically references "my medical provider" (singular use) as an assignee, but denotes four potential objects - one business entity and three individuals - of the verb "assign," which does not constitute a "clear and unequivocal" assignment of the participant's ERISA beneficiary status to Plaintiff individually.

The Court does not agree. The Plan participant agreed to

9

"irrevocably assign to you, my medical provider, all of my rights and benefits" under the Plan.  Even though the heading of the document contains the practice's name and lists three medical providers, there is no dispute that the participant's medical provider was Plaintiff, who performed the participant's surgery, and not one of the other two providers, or the practice itself.  Thus, we think it plain enough that "you" in the document is Plaintiff, to whom the participant assigned all of her rights and benefits under the Plan.  In other words, the assignment unambiguously means "I irrevocably assign to [Rahul Shah, M.D.], my medical provider, all of my rights and benefits" under the Plan.[7]  The assignment is valid and therefore confers standing to Plaintiff to bring his claims against the Plan for violations of ERISA.[8]  See, e.g., American Chiropractic Ass'n,

---

[7] This assignment also validly assigned to Plaintiff the participant's rights and claims to file suit against the Plan under ERISA or other applicable laws.  See American Chiropractic Ass'n, 625 F. App'x at 172.

[8] If Plaintiff's practice, Premier Orthopaedic Associates of Southern New Jersey, filed suit under the assignment of benefits, it is questionable whether it would have standing. See, e.g., American Chiropractic Ass'n, 625 F. App'x at 176-77 (explaining that because claims for monetary relief often require an individual inquiry, associations "generally" cannot sue for monetary damages, and finding even though the medical provider, an individual member, had standing because he sought monetary reimbursement for services he provided to plan-participant patients, the association had not shown that any of its members possessed standing to seek non-monetary relief, and thus the association lacked representational standing to sue the plan); see also Franco v. Connecticut General Life Ins. Co., 647

625 F. App'x at 171-72 (finding that the following assignment afforded the medical provider, but not the practice, standing to sue his patients' insurers for reimbursement for services he provided: "I authorize payment of medical benefits to High Street Rehabilitation, LLC for all services rendered. I understand that I am financially responsible for all charges whether or not they are paid by insurance (commercial, worker's compensation, auto, etc.). In the event of an unpaid balance, I am aware that my bill will be sent to the collection agency and that I will be held responsible for any and all charges incurred, including attorney fees.").

> ### 2. *Whether the Plan abused its discretion in its payment to Plaintiff*

Plaintiff – who stands in the shoes of his patient through an assignment of benefits – seeks benefits he claims he is owed under the Plan. Plaintiff claims that Defendant violated its fiduciary duty by failing to pay him the benefits owed under the plan for nonparticipating, out-of-network providers such as himself. These claims are governed by ERISA § 502(a)(1)(B), which allows a plan participant or beneficiary to bring a civil

---

F. App'x 76, 82 (3d Cir. 2016) ("That the Provider Plaintiffs have standing to sue under ERISA does not mean that the Association Plaintiffs, i.e., the medical societies and associations whose members provide ONET services to CIGNA insureds, necessarily have standing to bring ERISA claims as well.").

action to, among other things, "recover benefits due to him under the terms of his plan," 29 U.S.C. § 1132(a)(1)(B), and § 404 of ERISA, which provides that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . [by] providing benefits to participants and their beneficiaries," 29 U.S.C. § 1104.

This Court's standard of review for claims alleging violations of these provisions is an abuse of discretion.  See Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012) (citations omitted) (explaining that when an ERISA plan grants its administrator discretionary authority, as in the case here, the deferential standard of review is appropriate, and an administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law).  Thus, the issue to be decided is whether Defendant was arbitrary and capricious in its interpretation of the plan and resulting payment to Plaintiff.  The Court finds that Defendant did not abuse its discretion in this case.

The Plan provides, in relevant part, the following regarding nonparticipating, out-of-network providers:

> Surgical services - surgery - out-of-network: Covered – 70% after deductible

(Docket No. 19-2 at 25, Benefits Summary.)

> Nonparticipating Providers - Nonparticipating providers do not have signed agreements with Blue Cross Blue Shield.

This means they may or may not choose to accept the approved amount as payment in full. If your present providers do not participate with Blue Cross Blue Shield, ask if they will accept the approved amount as payment in full for the services you need. This is called participating on a "per claim" basis and means that the providers will accept the approved amount as payment in full for the specific services on the claim. You are responsible for any deductibles, copayments, and/or coinsurances required by your plan along with charges for non-covered services. If a nonparticipating provider will not accept the approved amount as payment in full for covered services, you will be responsible for the difference between the approved amount and the provider's charges in addition to any deductible, coinsurance and/or copayment required by your plan.

(Docket No. 19-2 at 46, General Information for Blue Cross Blue Shield Medical, Selecting a Provider.)

Charges to You When Nonparticipating Providers are Used – Nonparticipating providers may ask you to sign a form acknowledging that you are responsible for paying any amount they charge above the Blue Cross Blue Shield approved amount. Blue Cross Blue Shield does not require you to sign this form. By signing this form you agree to pay the difference between the approved amount and what the provider charges. The decision to sign or not is between you and your provider. However, even if you are not asked to sign the form, or you refuse when asked, the provider may still bill you for more than the BCBS approved amount. The responsibility for paying this difference is between you and the provider.

(Id. at 47.)

Approved Amount — The Blue Cross Blue Shield maximum payment level or the provider's billed charge for the covered service, whichever is lower. Deductibles, copayments, coinsurance and sanctions are deducted from the approved amount.

(Docket No. 19-2 at 87, Plan Glossary.)

Nonparticipating Providers — Providers that have not signed participation agreements with Blue Cross Blue Shield

13

agreeing to accept the Blue Cross Blue Shield payment as
payment in full.  However, nonparticipating professional
(non-facility) providers may agree to accept the Blue Cross
Blue Shield approved amount as payment in full on a per
claim basis.

(Id. at 90.)

Coverage Exclusions and Limitations - In addition to the
exclusions and limitations listed elsewhere in this SPD
booklet, unless otherwise stated, the following exclusions
and limitations apply: . . . Charges from a
nonparticipating provider that are in excess of the Blue
Cross Blue Shield approved amount.

(Id. at 73-74, Coverage Exclusions and Limitations.)

In response to the participant's appeal, Defendant

explained:

Your provider, Rahul Shah, M.D., is an out-of-network, non-
participating provider.  Because this provider does not
participate with BCBS, they may choose not to accept the
BCBS approved amount as payment in full.  The approved
amount for the surgical services you received from this
provider on February 3, 2016 is $7,106.44.  This claim was
processed at the in-network benefit level.  At the time
this claim was processed, you had not reached your in-
network out-of-pocket maximum, and therefore are
responsible for 10 percent of the allowed amount ($710.64)
as your in-network coinsurance requirement.

The claim was submitted through the BlueCard program and
sent to BCBSM for payment consideration.  Because the claim
was submitted through the BlueCard program, the host plan
(Horizon BCBS of New Jersey) determines the allowed amount
and payment policies associated with your claim.

As such, the host plan determined that procedure codes
63030 (laminotomy), 20936 (autograft for spine surgery
only), 20930 (allograft for spine surgery only), and 77003
(fluoroscopic guidance) are not payable for this claim.
Additionally, procedure code 22851 (application of
intervertebral biomechanical device(s)) was submitted twice
on this claim, and therefore the host plan determined that
only one of these services are payable.

14

In the appeal letter Ms. Yesenia Torres requested
additional documentation regarding the determination of the
payment amount. Because your claim was processed through
the BlueCard program, information regarding the allowed
amount or payment policies used to calculate the payment
determination for these services must be obtained from the
host plan.  In order to request additional documentation,
including the documentation used in this appeal, please
follow the instructions listed at the end of this letter.[9]

(Docket No. 15-8 at 2.)

Defendant further explains in its motion that because

Plaintiff had no provider agreements with either BCBSM or

Horizon, for out-of-network pricing purposes BCBSM applied the

out-of-network pricing which Horizon would have applied to each

billed Current Procedure Terminology ("CPT") code if the

participant had been a Horizon member.  That pricing, in turn,

derived from a multiple of the charge which the Centers for

_____

[9] It appears that the reimbursement of benefits became more
complex in this case because the participant accessed care out-
of-state, which implicated the BlueCard program.  The Plan
explains:

> Like all Blue Cross and Blue Shield Licensees, BCBSM
> participates in a program called "BlueCard."  Whenever
> Members access health care services outside the geographic
> area BCBSM serves, the claim for those services may be
> processed through BlueCard and presented to BCBSM for
> payment in conformity with network access rules of the
> BlueCard Policies then in effect (Policies).  For more
> detail, refer to the Blue Cross Blue Shield contract by
> contacting the Kellogg People Services Center.

(Docket No. 19-2 at 78.)  It is not clear whether Plaintiff or
his patient followed the procedure outlined in the Plan or the
appeal denial letter to obtain more information from the host
plan about its payment procedures and policies.

Medicare and Medicaid ("CMS") apply to those same codes. (Docket No. 15-2 at 5.) Defendant further explains that Horizon's out-of-network allowances for the billed CPT codes are based on 150% of the pricing applied by the Centers for Medicare and Medicaid Services. (Docket No. 15-3 at 2.) Defendants relate that Horizon transmitted this pricing information to BCBSM, but whether and to what extent Host Plan pricing is applied by the Home Plan is left to the discretion of the Home Plan. (Id. at 3.)

Plaintiff argues that the Plan provides for an out-of-network reimbursement rate of 70% of his charges, and he should be reimbursed accordingly. He argues that the Plan must be interpreted this way because although the Plan provides reimbursement for out-of-network providers at 70% of approved charges, the Plan is silent as to what the "approved charges" are. Plaintiff contends that the Plan violated ERISA because the rate he was paid was essentially a mystery until Defendant filed its motion for summary judgment. Plaintiff points out that the Plan does not even mention the Medicare rates in the context of out-of-network providers, and such reimbursement rate was not explicitly set forth in the Summary Plan Description.

The Court disagrees for several reasons. First, even though Plaintiff is correct that the Plan does not explain how the "approved charges" are calculated, and the Plan could have

expressly articulated the rate, he provides no proof to refute Defendant's explanation of what the "approved charges" are. Plaintiff simply argues that his UCR charges should constitute the "approved charges" rather than Defendant's CPT/Medicare rate. The failure of the Plan to blindly accept Plaintiff's definition of "approved charges" as its own does not necessarily constitute arbitrary and capricious conduct.

Second, Plaintiff does not argue that the Plan did not pay him the precise amount according to the Plan's articulated calculation. It would be one thing if the Plan explained how it calculated its "approved charges" and then did not reimburse Plaintiff per that calculation. But Plaintiff does not make such a claim here.

Third, to the extent Plaintiff argues that the Plan terms are unfair and ambiguous, the claims before the Court do not require the assessment of the Plan participant's interpretation of the Plan or her reliance on certain terms in the Plan. That is a different case from the one pleaded here.[10] See CIGNA Corp.

_____

[10] Plaintiff has not asserted a claim of equitable reformation in his complaint, and there is no evidence in the record that the Plan participant relied upon the representations by the Plan regarding the payment of benefits to Plaintiff that would support Plaintiff's contention that he was to be paid 70% of his charges. Additionally, Plaintiff has not pleaded a claim for violations of 29 U.S.C. §§ 1022(a), 1024(b) (ERISA §§ 102(a) and 104(b)), which require a plan administrator to provide beneficiaries with summary plan descriptions and with summaries of material modifications, "written in a manner calculated to be

<u>v. Amara</u>, 563 U.S. 421, 435–36 (2011) (finding that §

502(a)(1)(B) only grants a court the power to enforce the terms

of the plan, not change the terms of the plan); <u>id.</u> at 443

(finding that when a court exercises its authority under §

502(a)(3) to impose a remedy equivalent to estoppel, including

reformation, a showing of detrimental reliance must be made).

As set forth above, the SPD repeatedly cautions Plaintiff's

patient that choosing an out-of-network, nonparticipating

provider may result in financial obligations not covered by the

Plan.  By asking Plaintiff to assign her benefits under the Plan

to him, he knowingly assumed the benefits available to him under

the Plan.  The Plan cannot be faulted for Plaintiff's failure to

determine his reimbursement rate prior to the assignment of

benefits and the surgery on his patient.[11]

As this Court noted in a similar case involving the same

Plaintiff, when Plaintiff's patient first consulted Plaintiff

about his services, he had several options:  (1) he could have

set what he perceived as the market rate for his services and

---

understood by the average plan participant," that are
"sufficiently accurate and comprehensive to reasonably apprise
such participants and beneficiaries of their rights and
obligations under the plan."

[11] The fact that the participant's out-of-state surgery required
the special "BlueCard" procedure would further counsel a
provider to pre-determine the expected reimbursement for his
medical services.

conditioned providing his services on the payment of that fee, leaving to the patient reimbursement under applicable insurance, or (2) he could have agreed to accept his patient's insurance and the benefit it provided and billed his patient for the remaining balance. <u>Rahul Shah v. Horizon Blue Cross Blue Shield of New Jersey</u>, 2018 WL 1509087, at *5 (D.N.J. 2018). "What he could not do was accept the benefit under the Plan, take an assignment from [his patient]," and "through this lawsuit seek to blow up – without legal or factual support - the carefully and clearly drafted mutually beneficial agreement [between employer and employee]." <u>Id.</u>

As in his other case, Plaintiff here seeks from the Plan the full reimbursement of his charges at a rate he unilaterally set, while ignoring his own duplicative charges and any of his patient's financial obligations under the Plan, simply because he thinks he is entitled to that amount of his services. He cites no provision in the Plan that entitles him to UCR rates, much less the 100% of such rates his Complaint demands[12] and

---

[12] In his complaint, Plaintiff has demanded the Plan pay him the balance of the full sum of his charges. This contradicts Plaintiff's own interpretation of the Plan. Plaintiff's opposition brief acknowledges his patient's own obligations, such as deductibles and co-insurance, which would reduce the reimbursement of his total charges from Defendant off the top. Moreover, he contends that the Plan language mandates reimbursement of 70% - not 100% - of his charges, and nowhere in his opposition brief does Plaintiff argue he is entitled to 100% of his charges. Additionally, Plaintiff does not appear to

offers no evidence that anyone actually pays him such rates for his services. Nothing in ERISA allows a medical provider who voluntarily accepts a patient's health insurance to determine on his own what benefits an employer should provide for its employee.

The Court recognizes that this case differs from the Rahul Shah v. Horizon Blue Cross Blue Shield of New Jersey, matter in that the plan at issue there made clear the application of a fee formulation that hinged on the Medicare rate. 2018 WL 1509087, at *4. And there should be no doubt it would have benefited everyone with a stake in this matter if the Plan at issue here had been more explicit in the method employed to calculate how out-of-network providers were compensated. However, as we have noted this Court does not sit to reform or renegotiate the terms of the Plan. CIGNA Corp. v. Amara, 563 U.S. 421, 435–36 (2011).

Rather, the Court sits to determine whether the Plan acted in an arbitrary and capricious manner. Nothing Plaintiff has offered, or this Court is aware of, suggests that Defendant's use of a "70% of 150% of the Medicare rate" formulation violated

---

challenge the denial of certain charges because they were not covered under the Plan or were submitted twice, which also reduces Plaintiff's overall recovery even before the "approved charges" calculation is performed. In short, there appears to be no factual or legal justification for the Complaint's demand for the full sum of his charges. Plaintiff and his counsel are on notice of their obligation to abide by Fed. R. Civ. P. 11 in all respects.

the express terms of the Plan, the implicit terms of the Plan,
ERISA itself, or customary practices and standards in the health
insurance industry. It is certainly less than what Plaintiff
asserts as the value of his services. But has we have noted,
Plaintiff was free to make that determination, or assume such
risks, when he decided to treat the patient/assignor. There is
simply nothing in the Plan to show that Plaintiff's calculation
of the value of his services is the benefit his assignor
bargained for or his assignor's employer agreed to pay.

## CONCLUSION

For the reasons expressed above, Defendant has established
that the Plan did not abuse its discretion when it paid
Plaintiff for his surgical services as an out-of-network,
nonparticipating provider. Consequently, Defendant is entitled
to judgment in its favor on all of Plaintiff's claims.

An appropriate Order will be entered.


Date: May 10, 2018                      s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.